☑ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information associated with email account mgvcomino@gmail.com, as well as all Google,<br>LLC accounts linked to this account by cookie values, creation IP addresses, recovery<br>email, SMS recovery, Android device, telephone numbers, and other similar identifiers,<br>that is stored at premises owned, maintained, controlled, or operated by Google, LLC, a<br>company headquartered at 1600 Amphitheater Parkway, Mountain View, CA 94043. | )<br>)<br>)<br>)<br>)<br>) |

Case No.23-866M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     4/17/2023     *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Hon. Nancy Joseph     .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: 4/3/2023 @ 2:05 p.m.

*Judge's signature*

City and state:     Milwaukee, WI

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

This warrant applies to information associated with email account

mgvcomino@gmail.com, as well as all Google, LLC accounts linked to this account by cookie

values, creation IP addresses, recovery email, SMS recovery, Android device, telephone

numbers, and other similar identifiers, that is stored at premises owned, maintained, controlled,

or operated by Google, LLC, a company headquartered at 1600 Amphitheater Parkway,

Mountain View, CA 94043.

# ATTACHMENT B

## Particular Things to be Seized

## I.  Information to be disclosed by Google LLC (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on or about December 9, 2022, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.  The contents of all emails associated with the account from March 1, 2020, through the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

2

c.      Stored web history, cloud-based file storage, social networking profile and friends (connections) list;

d.      Text or voice messages, call logs and associated metadata;

e.      The types of service utilized;

f.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

g.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

h.      All records relating to user attribution showing who used or owned the device associated with this account including images, documents, logs, communication records;

i.      Evidence indicating how and when the email account was accessed or used, to determine the chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

j.      Evidence indicating the geographic location of email access points at times relevant to the investigation;

k.      Evidence indicating the email account owner's state of mind as it relates to the crime under investigation; and

l.      All information that constitutes evidence of violations of 18 U.S.C. § 371 (conspiracy), 1347 (healthcare fraud), and 152 (bankruptcy fraud), and 42 U.S.C. §

3

1320a-7b(b)(2) (paying healthcare kickbacks); or contraband or other items illegally possessed; or property designed for use, intended for use, or used in committing violations of 18 U.S.C. § 371 (conspiracy), 1347 (healthcare fraud), and 152 (bankruptcy fraud), and 42 U.S.C. § 1320a-7b(b)(2) (paying healthcare kickbacks).

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 1347 (healthcare fraud), and 152 (bankruptcy fraud), and 42 U.S.C. § 1320a-7b(b)(2) (paying healthcare kickbacks), those violations involving **Kestrel/Comino** and occurring after March 1, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Records of communications related to: (1) the relationship between Comino and any Medicare provider, DME supplier, physician staffing company or marketing company dealing with Medicare reimbursable services or items, (2) Comino's work for, or with, any Medicare provider, DME supplier, physician staffing company or marketing company; (3) the prescription or order of Medicare reimbursable services or items for patients; (4) investigations by Medicare or insurance providers regarding prescribed or ordered health care services or items;

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

4

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Information associated with email account mgvcomino@gmail.com, as well as all Google,<br>LLC accounts linked to this account by cookie values, creation IP addresses, recovery email,<br>SMS recovery, Android device, telephone numbers, and other similar identifiers, that is<br>stored at premises owned, maintained, controlled, or operated by Google, LLC, a company<br>headquartered at 1600 Amphitheater Parkway, Mountain View, CA 94043. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No.<br>)     23-866M(NJ)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1347, &<br>152; 42 U.S.C. § 1320a-7b(b)<br>(2) | Conspiracy; healthcare fraud; bankruptcy fraud; and paying healthcare kickbacks. |

The application is based on these facts:

See attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jill Dring, FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 41 by
telephone
*(specify reliable electronic means)*

Date: 04/03/2023

_____
*Judge's signature*

City and state: Milwaukee

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jill Dring, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Google LLC, 1600 Amphitheater Parkway, Mountain View, CA 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since March of 2013.  As a Special Agent, I investigate civil and criminal matters related to health care fraud involving violations of the Health Care Fraud Statute, False Claims Act, Anti-Kick Back Statute and Stark Law. Prior to investigating health care fraud matters, I investigated criminal and national security related computer intrusion matters involving botnets, distributed denial of service attacks, the distribution of SPAM, malicious software, the theft of identification information, and other computer-based fraud. I have received training in computer technology and computer-based fraud and health care fraud.

3.      The facts in this affidavit are known to me through my personal knowledge, training, experience, and through information provided to me by other law enforcement officers in the course of their official duties, whom I consider to be truthful and reliable. This affidavit also relies on Medicare data, which based on my training and experience, I believe to be accurate and reliable.

1

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371 (conspiracy), 1347 (healthcare fraud), and 152 (bankruptcy fraud), and 42 U.S.C. § 1320a-7b(b)(2) (paying healthcare kickbacks) have been committed by Michael Comino and AEAK Investments, LLC ("AEAK"), which in turn is 50% owner of Kestrel Medical Supply ("Kestrel"), 888 Thackery Trail, Suite 105, Oconomowoc, WI 53066. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

**JURISDICTION**

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.

**PROBABLE CAUSE**

I.     *Medicare Background*

7.     The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are sixty-five years of age or older, or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

8.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

2

9.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

10.    Specifically, Medicare Part B covers medically necessary physician office services, including the ordering of Durable Medical Equipment ("DME"), Prosthetics, Orthotics, and Supplies, such as arm, leg, back, and neck braces ("braces").

11.    Suppliers of braces are entities or individuals that are required to enroll with Medicare to become an authorized Medicare provider. Suppliers must complete a Medicare Enrollment Application for Brace Suppliers (CMS Form 855S). That application verifies data by requiring an on-site visit to determine if the supplier meets all of the Medicare Supplier Standards. CMS issues a Medicare supplier number to approved suppliers and maintains a national brace supplier file. If a physician prescribes braces for a Medicare beneficiary, a Medicare-approved and participating supplier must provide it.

12.    Section 1847(a)(2) of the Social Security Act defines Off-The-Shelf ("OTS") orthotics as those orthotics described in Section 186l(s)(9) of the Act for which payment would otherwise be made under Section 1843(h) of the Act, which require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual. *See* 42 U.S.C. § 1395w-3. Orthotics that are currently paid under Section 1834(h) and described in Section 1861(s)(9) of the Act are leg, arm, back, and neck braces. *Id*. § 1395m.

13.    The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provides the Medicare definition of "braces." Braces are defined in this Section as "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

3

14. By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers are given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

15. Health care providers may only submit claims to Medicare for reasonable and medically necessary services that they rendered. Medicare does not pay claims procured through kickbacks and bribes or based on falsified medical records.

16. For certain DME products, such as OTS knee braces billed under codes L1833 and L1851, orders are deemed not reasonable and necessary unless the ordering/referring physician documents knee instability using an objective description of joint laxity determined through an examination.

17. Medicare uses the term "ordering/referring" provider to identify the physician who ordered, referred, or certified an item or service reported in that claim. A provider "orders" non-physician items or services for the beneficiary, such as braces, clinical laboratory services, or imaging services.

18. Medicare requires ordering/referring physicians to document medical necessity and other coverage for braces. Medicare regulations require health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare

4

requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records are required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider. Brace suppliers are required to maintain copies of these records for six years and three months and to make them available upon request.

19.    To receive reimbursement from Medicare for non-physician items such as OTS orthotics, a brace supplier is required to submit a claim, either electronically or in writing, through Form CMS-1500 or UB-92. Claim forms require important information, including: (a) beneficiary's name and identification number; (b) the name and identification number of the referring/ordering provider who ordered the OTS orthotics; (c) the health care benefit item that was provided or supplied to the beneficiary; (d) the billing codes for the specified item; and (e) the date upon which the item was provided or supplied to the beneficiary.

## II.    _National Investigation by the FBI and the Department of Health and Human Services, Office of the Inspector General_

20.    The Kestrel/Comino investigation is part of a larger FBI and Department of Health and Human Services, Office of Inspector General (HHS-OIG) investigation into nationwide telemedicine schemes that have resulted in hundreds of millions of dollars in false and fraudulent claims submitted to Medicare.[1] The schemes involve companies that pay illegal bribes and kickbacks in exchange for signed doctors' prescriptions for DME, such as braces, which the companies submit for payment to Medicare.

---

[1] There was not one single telemedicine brace scheme. There were many overlapping and parallel telemedicine brace schemes. There were variations in exactly how the scheme was performed, including that the same companies often took on more than one role as part of the process. This section of the affidavit is intended to provide the general parameters of a typical brace telemedicine scheme to provide context for Kestrel/Comino's actions and role in the scheme.

21.     In these schemes, the doctors who sign the orders for the DME either have no contact with patients or have contact with them through brief telephone calls. In addition, the DME ordered is often medically unnecessary, not eligible for Medicare reimbursement, and/or is not provided as represented.

22.     In general, the schemes are operated by telemarketers contacting Medicare beneficiaries and collecting information. The information is then transmitted to a telemedicine doctor for a "consult." The telemedicine consult (which may or may not include a physician speaking with a beneficiary) results in a signed physician order forwarded to a DME supplier which, in turn, bills Medicare for the DME ordered by the telemedicine physician.

23.     Based on the nation-wide investigation to date, the first step of the process - patient information collection - is handled by a marketing company. Usually, a Medicare beneficiary responds to a television or online advertisement placed by a marketing company. However, sometimes Medicare beneficiaries are simply cold-called. Subsequently, the patient talks to someone working in a call center (often outside the United States). During this call, the call center representative asks the patient if he/she wants free or low-cost braces, or other DME. The representative confirms that the patient is enrolled with Medicare and collects the patient's Medicare number and other identifying information such as address and phone. The representative then pressures the patient to agree to speak to one of its doctors, rather than the patient's own doctor, claiming that choice would allow the patient to more quickly receive the braces. If the patient agrees to speak to one of the company's doctors, the call center representative forwards the call to a doctor identified by the company to be licensed in the patient's state.

24.     The call with the doctor is the next step in the scheme. The doctors typically have a brief, perfunctory consultation with the patient. These consultations sometimes last less than a minute,

others last a few minutes. Some of the "consultations" only involve the doctor reading out the types of braces to be ordered. On other occasions, no telephone conversation takes place at all. At the conclusion of the call (when it happens), the doctor authorizes use of his or her electronic signature in a prescription for a brace (or, often, multiple braces such as a back, two knee, two ankle, shoulder, and two elbow braces). The telemedicine companies then pay the doctors a fee for each patient, usually $20 or $30.

25.     The final step in the scheme involves the telemedicine company selling the signed doctors' prescriptions. The telemedicine companies often sell the signed prescriptions to a marketing company, which in turn, resell the signed prescriptions to a DME company that bills Medicare for the braces and orders and ships the DME to the patient. In other instances, the telemedicine companies sell signed prescriptions directly to the DME companies.[2]

26.     As part of the schemes, as described further herein, the DME companies that billed Medicare paid approximately $89 per patient order, which could include more than one brace.

III.     *Kestrel's and Comino's Conduct*

27.     Kestrel is a Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) supplier enrolled in the Medicare program since August 2018. Wisconsin resident Bruce Johnson started Kestrel in 2018 after selling a similar business that he owned. Initially, Johnson was the sole owner of Kestrel.

28.     Kestrel later filed for chapter 7 bankruptcy on January 29, 2021. During the bankruptcy hearing on April 13, 2022, Johnson testified that Kestrel was not making much money because he did not have contacts with advertising and medical professionals. In 2019, Kestrel earned approximately $74,000 in revenue on approximately 95 claims.

---

[2] As part of the scheme, as described further herein, the DME companies that billed Medicare paid approximately $89 per patient order, which could include more than one brace.

29.     In March 2020, Johnson partnered with Comino, who became a fifty percent partner in Kestrel through AEAK, an entity Comino controlled. Comino resided in Ormond Beach, Florida. Johnson explained in his bankruptcy testimony that he and Comino did not have a written agreement, but Johnson was to handle customer service, the finances, and paying bills, and Comino was to handle the marketing. In interviews with agents on July 7 and July 8, 2022, Johnson stated that Comino initiated and maintained Kestrel's relationships with marketing companies.

30.     In 2020, Kestrel's revenue increased to approximately $2,900,000 on approximately 2,100 claims. In 2020, Kestrel also made approximately $1,527,453.80 in payments to marketing companies.

31.     An analysis of claims data from February 3, 2018, through February 3, 2021, revealed that Kestrel billed Medicare for $5,107,736.51 and was paid $2,601,688.73. A statistically representative sample of beneficiaries billed during this period was selected and found an average overpayment per claim of $734.47 for sample group 1 and $1,922.17 for sample group 2. Interviews were then conducted of fourteen beneficiaries. These interviews revealed that most of the beneficiaries were solicited telephonically and told the caller they did not need the orthotics. Thirteen out of the fourteen beneficiaries interviewed did not know the referring provider and did not have a medical examination. One of the Medicare requirements for telemedicine is that the practitioner have a prior relationship with the patient. Two of the beneficiaries were billed for orthotics they did not receive.

32.     In 2020 and 2021, Medicare received at least 14 complaints from beneficiaries about DME received from Kestrel. The complaints requested Kestrel to pick up the DME that had been sent to beneficiaries.

8

33.     For example, on February 27, 2021, beneficiary D.T. wrote to Medicare about DME

they had received in the mail and stated, "I did not request this and will not be paying. My doctor did

not request. I have nothing wrong with my knee."

34.     On October 29, 2020, Medicare, through SafeGuard Services LLC ("SafeGuard"),

suspended Kestrel's Medicare payments based on "credible allegations of fraud." SafeGuard was the

Southeastern Unified Program Contractor, which performed program safeguard functions for the

Medicare program.  On August 10, 2021, SafeGuard provided Kestrel a final notice of overpayment

findings. SafeGuard's audit of Kestrel was based on "proactive data analysis" that identified Kestrel as

a provider "without a corresponding Part A or B relationship with their referring physician, indicating a

likelihood that DME was being dispensed without proper medical necessity being established."

SafeGuard's audit process consisted of creating a statistically representative sample, requesting and

reviewing medical records, and conducting interviews. As a result of that process, SafeGuard

determined that 100% of the claims examined should have been denied.

35.     In an interview with agents on July 7, 2022, Johnson stated that he knows it is wrong to

buy "leads."  He stated that he didn't call up the marketing companies and say he wanted 50 leads,

because he understood that to be wrong and against the criteria Medicare established. He stated he

never thought what they were doing was illegal.

36.     Later in the interview, after reviewing some emails with the agents, Johnson agreed that

he bought prescriptions and disguised the marketing for buying prescriptions. Johnson acknowledged

he was aware of people getting in trouble over buying and selling prescriptions from at least April 2019

when the DOJ executed a DME/telemarketing takedown. Johnson repeatedly acknowledged "yes" to

the statement that he chose to move forward and continued to buy prescriptions and then bill those

DME prescriptions to Medicare.

9

37.      Johnson admitted he knew buying prescriptions was wrong and added, "Absolutely."

Johnson stated, "Yes, I was buying prescriptions, okay, we were trying to do it, end of story, yes I

bought prescriptions." Johnson claimed he saw it as doing it legitimately by purchasing them through

marketing companies in a legitimate way. Johnson admitted several times in the July 7 interview to

buying prescriptions. In a second interview on July 8, 2022 Johnson admitted to buying prescriptions at

times, but also repeatedly denied paying a set price for prescriptions.

38.      During a bankruptcy court hearing on July 6, 2022, Comino testified about his

involvement with Kestrel. He stated that in early 2020, he and Johnson decided to go into business

together. Kestrel was a relatively small DME company, with a relatively low marketing budget.

Comino said he received 50% ownership to develop the marketing side of the business. He started

AEAK in February 2020 for that purpose. He was its only employee, and Kestrel paid AEAK by wire

transfer. Kestrel paid approximately $167,500 to AEAK, and approximately $20,540.30 to another of

Comino's entities, Senior Life Planning, in 2020.

39.      Comino stated that at some point he talked with all the marketing companies. The

standard terms for the agreements with the marketing companies were that Kestrel would pay $250 per

marketing hour and provide a set budget on a weekly, biweekly, or monthly basis. He stated that an

attorney drafted the agreements and Johnson signed them. Comino stated that the marketing companies

paid by Kestrel "ultimately led to the generation of prescriptions that would come to our DME." He

said that both he and Johnson reviewed weekly reports to see if marketing companies provided claims

that were approved by Medicare.

40.      Comino stated that he would have seen some of the invoices to the marketing

companies, but that Johnson handled the invoicing and payment. He stated that they did not have a

process to check whether the marketing hours on an invoice were correct; instead, they knew which

10

marketing companies were performing well by the patients that came in. He said that, "Our fee was our fee regardless of how many hours they put in."

41.     Comino stated that they would have a set budget with a marketing company, which could change weekly, biweekly, or monthly. He stated that in most cases he was the one talking to the marketing companies.

42.     Comino testified that he owned another company, American Energy Today, that provided marketing services to Kestrel. According to Comino, Kestrel paid American Energy Today after Medicare suspended Kestrel's license because he tried different marketing projects, such as glucose monitors, workers' compensation, and CBD products to generate business for Kestrel. He stated that he worked on that in November and December 2020. The agreement between Kestrel and American Energy Today was signed by Comino and Johnson on December 15, 2020.

43.     Kestrel made two payments to American Energy Today, one for $100,000 on December 23, 2020, and another for $50,000 on December 30, 2020. Those payments related to two invoices from American Energy Today, dated December 23, 2020, and December 30, 2020. The invoice for $100,000 was based on 400 hours at $250 per hour. When asked what records he had keeping track of his hours, Comino said he did not have any.

44.     During an interview with FBI agents, Johnson said "yes" in response to a question asking whether the payments to American Energy Today was a way to divest the company of assets. Johnson testified again in the bankruptcy proceeding on August 30, 2022, and denied saying that Kestrel paid American Energy $150,000 to divest Kestrel of assets before filing for bankruptcy, which he said was not true. Johnson stated that they spoke with an attorney about filing for bankruptcy sometime in early December 2020. Johnson denied saying that Kestrel purchases prescriptions even

though he knew it was wrong. Instead, he stated that they bought leads, which were "different than prescriptions" and they "weren't designating specific numbers of prescriptions requested."

45.     Based on the above, it appears Comino, Johnson and Kestrel engaged in a scheme similar to those described above, in which: (1) telemarketers contact Medicare beneficiaries and collect information, which is transmitted to a telemedicine doctor for a consult; (2) the consult (which may or may not include a physician speaking with a beneficiary) results in a signed physician order forwarded to Kestrel, the DME supplier; and (3) Kestrel bills Medicare for the DME.

46.     During a bankruptcy court hearing on March 2, 2021, Johnson testified that he used email address kestrelmedical@gmail.com for business emails. During his testimony on July 6, 2022, he stated that he reviewed emails sent to that Kestrel Medical email address.

47.     Comino, however, regularly used mgvcomino@gmail.com for Kestrel business.

48.     For example, on January 9, 2020, mgvcomino@gmail.com emailed a list of patient names to kestrelmedical@gmail.com with the note: "Have the checks for the following patients came [sic] in yet? trying to update google sheet."

49.     On March 23, 2020, mgvcomino@gmail.com instructed kestrelmedical.com, "don't pay" in response to an invoice from marketing company Alfa Medical Group.

50.     On April 2, 2020, kestrelmedical@gmail.com sent an email to mgvcomino@gmail.com stating "Many Noel and Harold Wiaro got braces already.  Harold Also said he never talked to a Dr. Was told a Dr would call but never did."

51.     On June 2, 2020, patty@dmebillers.com sent an email with the subject "Kestrel MBSNI Invoice May 2020" with attachments "Kestrel Invoice May 2020.pdf" and "Kestrel Deposit Summary May 2020.xls" to kestrelmedical@gmail.com and mgvcomino@gmail.com.  Mgvcomino@gmail.com appeared as "Michael Comino Kestrel" in the "To" line of the email.

12

52.     On June 23, 2020, mgvcomino@gmail.com forwarded an invoice from Senior Life

Planning, LLC to kestrelmedical@gmail.com with a message, "please confirm when wire is sent." The

attached invoice was addressed to "Kestrel Medical" and the description of work is "marketing hours."

53.     On October 23, 2020, mgvcomino@gmail.com received an invoice for Kestrel Medical,

LLC for "marketing hours," which mgvcomino@gmail.com forwarded to kestrelmedical@gmail.com.

54.     On December 9, 2022, a preservation letter was sent to Google Inc. for the account

mgvcomino@gmail.com. On January 6, 2022, a subpoena for records was served to Google Inc. In

general, an email that is sent to a Google subscriber is stored in the subscriber's "mailbox" on Google

servers until the subscriber deletes the email. If the subscriber does not delete the message, the message

can remain on Google servers indefinitely. Even if the subscriber deletes the email, it may continue to

be available on Google's servers for a certain period of time.

55.     Based on my training and experience, it is likely that there are emails in the

mgvcomino@gmail.com account that are relevant to the investigation and cannot be obtained through

means other than a search of that email account.

BACKGROUND CONCERNING EMAIL

56.     In my training and experience, I have learned that Google, LLC provides a variety of on-

line services, including electronic mail ("email") access, to the public. Google, LLC allows subscribers

to obtain email accounts at domain names of their creation, like the email account[s] listed in

Attachment A. Subscribers obtain an account by registering with Google, LLC. During the registration

process, Google, LLC asks subscribers to provide basic personal information. Therefore, the computers

of Google, LLC are likely to contain stored electronic communications (including retrieved and

unretrieved email for Google, LLC subscribers) and information concerning subscribers and their use

of Google, LLC services, such as account access information, email transaction information, and

13

account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

57.     A subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google, LLC. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

58.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

59.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers

14

often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

60.      In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

61.      As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses,

15

investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

<u>CONCLUSION</u>

62.     Based on the forgoing, I request that the Court issue the proposed search warrant.

63.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google, LLC. Because the warrant will be served on Google, LLC, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with email account

mgvcomino@gmail.com, as well as all Google, LLC accounts linked to this account by cookie

values, creation IP addresses, recovery email, SMS recovery, Android device, telephone

numbers, and other similar identifiers, that is stored at premises owned, maintained, controlled,

or operated by Google, LLC, a company headquartered at 1600 Amphitheater Parkway,

Mountain View, CA 94043.

17

**ATTACHMENT B**

**Particular Things to be Seized**

I. **Information to be disclosed by Google LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on or about December 9, 2022, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a. The contents of all emails associated with the account from March 1, 2020, through the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

18

c.      Stored web history, cloud-based file storage, social networking profile and friends (connections) list;

d.      Text or voice messages, call logs and associated metadata;

e.      The types of service utilized;

f.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

g.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

h.      All records relating to user attribution showing who used or owned the device associated with this account including images, documents, logs, communication records;

i.      Evidence indicating how and when the email account was accessed or used, to determine the chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

j.      Evidence indicating the geographic location of email access points at times relevant to the investigation;

k.      Evidence indicating the email account owner's state of mind as it relates to the crime under investigation; and

l.      All information that constitutes evidence of violations of 18 U.S.C. § 371 (conspiracy), 1347 (healthcare fraud), and 152 (bankruptcy fraud), and 42 U.S.C. §

19

1320a-7b(b)(2) (paying healthcare kickbacks); or contraband or other items illegally possessed; or property designed for use, intended for use, or used in committing violations of 18 U.S.C. § 371 (conspiracy), 1347 (healthcare fraud), and 152 (bankruptcy fraud), and 42 U.S.C. § 1320a-7b(b)(2) (paying healthcare kickbacks).

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 1347 (healthcare fraud), and 152 (bankruptcy fraud), and 42 U.S.C. § 1320a-7b(b)(2) (paying healthcare kickbacks), those violations involving **Kestrel/Comino** and occurring after March 1, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Records of communications related to: (1) the relationship between Comino and any Medicare provider, DME supplier, physician staffing company or marketing company dealing with Medicare reimbursable services or items, (2) Comino's work for, or with, any Medicare provider, DME supplier, physician staffing company or marketing company; (3) the prescription or order of Medicare reimbursable services or items for patients; (4) investigations by Medicare or insurance providers regarding prescribed or ordered health care services or items;

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

20

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Case 2:23-mj-00866-NJ    Filed 04/03/23    Page 29 of 31    Document 1

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO

## FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the

United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this

certification is true and correct. I am employed by Google, LLC and my title is

_____. I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved. I state

that the records attached hereto are true duplicates of the original records in the custody of

Google, LLC The attached records consist of _____ [GENERALLY DESCRIBE

RECORDS (pages/CDs/megabytes)]. I further state that:

    a. all records attached to this certificate were made at or near the time of the occurrence

of the matter set forth by, or from information transmitted by, a person with knowledge of those

matters, they were kept in the ordinary course of the regularly conducted business activity of

Google, LLC, and they were made by Google, LLC as a regular practice; and

    b. such records were generated by Google LLC's electronic process or system that

produces an accurate result, to wit:

        1. the records were copied from electronic device(s), storage medium(s), or file(s)

in the custody of Google, LLC in a manner to ensure that they are true duplicates of the

original records; and

        2. the process or system is regularly verified by Google, LLC, and at all times

pertinent to the records certified here the process and system functioned properly and

normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____

Date                                Signature